**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF MISSOURI**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| FARMLAND INDUSTRIES, INC., et al. | ) | Case No. 02-50557-JWV |
| n/k/a/ Reorganized FLI, Inc., | ) | |
| | ) | |
| Debtor. | ) | |
| _____ | ) | |
| | ) | |
| J. P. MORGAN TRUST COMPANY | ) | |
| NATIONAL ASSOCIATION, in its | ) | |
| capacity as Trustee of the | ) | |
| FI LIQUIDATING TRUST, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adversary  No. 05-4020 |
| | ) | |
| HAROLD DEAN CLEBERG, ROBERT | ) | |
| HONSE, TERRY CAMPBELL, ALBERT | ) | |
| SHIVLEY,  LYMAN ADAMS JR., RON | ) | |
| AMUNDSON, BAXTER ANKERSTJERNE, | ) | |
| JODY BEXNER, RICHARD DETTEN, | ) | |
| STEVEN ERDMAN, HARRY FEHREN | ) | |
| BACHER, MARTIE FLOYD, WARREN | ) | |
| GERDES, BEN GRIFFITH, GAIL HALL, | ) | |
| BARRY JENSEN, RON JURGENS, | ) | |
| WILLIAM KUHLMAN, GREG PFENNING, | ) | |
| MONTE ROMOHR, JOE ROYSTER, | ) | |
| E. KENT STAMPER, ELI VAUGHN, | ) | |
| FRANK WILSON, TOM GIST, DONALD | ) | |
| GALES,  DONALD ANTHONY, LARRY | ) | |
| DAHLSTEN and OTIS MOLZ, | ) | |
| | ) | |
| Defendants. | ) | |

**<u>MEMORANDUM OPINION</u>**

On January 26, 2005, J.P. Morgan Trust Co., N.A., in its capacity as Trustee of the FI

Liquidating Trust ("Liquidating Trustee") initiated this adversary proceeding with a five-count

complaint ("Complaint") alleging that the Defendants – twenty-nine former officers and directors[1] of the Debtor, Farmland Industries, Inc. ("Farmland") – breached their fiduciary duties[2] and committed corporate waste in certain aspects of their management of Farmland.  Count I alleges that the Defendants breached their duty of care by recommending, approving, and constructing a fertilizer complex in Coffeyville, Kansas ("Coffeyville Complex").   Count II alleges that the Defendants breached their duty of care in evaluating and approving Farmland's acquisition of a company in North Little Rock, Arkansas, SF Services ("SF Merger").   Count III alleges that the Defendants breached their duty of care by making or approving decisions to assume  "catastrophic debt."   Count IV alleges (a) that the Director Defendants breached their duty of care by approving the payment of an allegedly unearned bonus to Farmland's then-CEO, Harold Cleberg, and (b) that Cleberg breached his duty of care by accepting the bonus.  Finally, Count V alleges that the Director Defendants' decision to approve and pay the bonus to Cleberg constituted corporate waste.

The Defendants have filed a motion to dismiss, and that is the matter presently before the Court.   In the motion, the Defendants advance several arguments in support of their motion to dismiss.  They argue that Counts I and II and portions of Count III should be dismissed because they are barred by the applicable Kansas statute of limitations.  They argue that all of the claims relating to the Officer Defendants should be dismissed because the Complaint fails to plead any cognizable claims against them.   And finally, the Defendants argue that either an exculpation provision ("Exculpation Provision") contained in Farmland's Articles of Incorporation[3] or the business

---

[1] The former officers are: Harold Dean Cleberg (CEO from 1992-August 2000) ("Cleberg"), Robert Honse (COO from 1995-2000, and CEO from September 200 to May 2002) ("Honse"), and Terry Campbell (executive vice-president and CFO from 1992-1998) ("Campbell") (collectively, "Officer Defendants").   The former directors are: Albert Shivley, Lyman Adams Jr., Ron Amundson, Baxter Ankerstjerne, Jody Bexner, Richard Detten, Steven Erdman, Harry Fehrenbacher, Martie Floyd, Warren Gerdes, Ben Griffith, Gail Hall, Barry Jensen, Ron Jurgens, William Kuhlman, Greg Pfenning, Monte Romohr, Joe Royster, E. Kent Stamper, Eli Vaughn, Frank Wilson, Tom Gist, Donald Gales, Donald Anthony, Larry Dahlsten, and Otis Molz ("Director Defendants").

[2] The Complaint only alleges breaches of the fiduciary duty of care, but, for reasons discussed below, the Court will analyze the Complaint as if it had also alleged breaches of the fiduciary duties of loyalty and good faith.

[3] The Exculpation Provision is found at Art. VII, § 2 of Farmland's Articles of Incorporation ("Articles").  Under most circumstances, the Court will not consider evidence outside of the pleadings when ruling on a motion to dismiss without first converting the motion into one for summary judgment.  But there is precedent for considering articles of incorporation in similar lawsuits where the authenticity of the document is undisputed.  *See, e.g.*, *Beddall v. State St. Bank & Trust Co.*, 137 F.3d 12, 17 (1st Cir. 1998).  Moreover, the Plaintiff has stated that it has no objection to the Court's consideration of the Articles.  (Trustee's Reply to Motion to Dismiss, 20 n.7)  Therefore, the Court will consider the Articles without converting the Defendants' motion into one for summary judgment.

judgment rule insulates all of the Defendants from liability, inasmuch as the Complaint has failed to allege facts sufficient to render the Exculpation Provision ineffective or to overcome the business judgment rule's presumption that the Defendants acted with due care and good faith.

The Plaintiff counters that: (1) the statute of limitations does not bar the Liquidating Trustee's claims because Missouri – not Kansas – law applies, and under Missouri law, the claims are not time barred; (2) there are "dozens" of specific allegations detailing the breaches of fiduciary duty of the Officer Defendants; and (3) the allegations in the Complaint are sufficient to render the Exculpation Provision (which only applies to Directors) ineffective and to overcome the presumption of propriety arising from the business judgment rule.

Upon review of the pleadings and relevant law, the Court will dismiss all of Plaintiff's claims, except Count IV against Defendant Cleberg and Count V against all of the Directors.

## I. STANDARD OF REVIEW

The Defendants bring this motion under Fed. R. Civ. P. 12(b)(6).[4]  In considering a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted, a court must accept as true all of the factual allegations in the complaint as well as the reasonable inferences that can be drawn from them.[5]  A court will dismiss a claim "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations."[6]

## II. CHOICE OF LAW

The causes of action asserted in the Plaintiff's complaint are all grounded in state law. When state law claims are brought in federal court, the court looks to the choice of law rules of the state in which it sits to determine the applicable substantive law.[7]  Thus, this Court looks to Missouri's choice of law rules.

With regard to the substance of the breach of fiduciary duty and corporate waste claims,

---

[4] Rule 12(b)(6) is applicable to bankruptcy adversary proceedings pursuant to Fed. R. Bank. P. 7012(b).

[5] *Davis v. Monroe Cty. Bd. Of Educ.*, 526 U.S. 629, 633, 119 S.Ct. 1661, 1666, 143 L.Ed.2d 839 (1999).

[6] *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S. Ct. 2229, 2232, 81 L. Ed. 2d 59 (1984).

[7] *Bridsell v. Holiday Ins.*, 852 F.2d 1078, 1079 (8th Cir. 1988).

Missouri choice of law rules require the application of the law of the state of incorporation.[8]  The Debtor was incorporated under the laws of Kansas.  Therefore, Kansas law applies to the substance of the Plaintiff's claims.[9]

The applicable statute of limitation, however, is determined by the laws of the state where the action "originates."[10]  A cause of action originates at the place where plaintiff's alleged damages are sustained and capable of ascertainment.[11]  Where, as is the case here, the claims involve a "purely economic injury to a corporation, without a physical injury precipitating the economic damages," the laws of the state where the corporate headquarters is located applies.[12]  Farmland's corporate headquarters was located in Kansas City, Missouri, so the Missouri statutes of limitation apply.

Under Missouri law, breach of fiduciary duty claims[13] must be brought within five years of the last item of damage.[14]  The Plaintiff alleges that the last item of damage arising from the breach of fiduciary duty claims was Farmland's Chapter 11 bankruptcy filing on May 31, 2002.  The Court assumes (for purposes of this motion only) that this is true, so the fiduciary duty claims are not

---

[8] *See Ranch Hand Foods, Inc. v. Polar Pak Foods, Inc.*, 690 S.W.2d 437, 444 (Mo. Ct. App. 1985).  *See also,* Restatement (Second) of Conflict of Laws, § 309.

[9] Due to the relative paucity of Kansas law on the issues *sub judice*, the Court will also consider Delaware corporate law decisions where appropriate.  Such decisions are relevant here because the Kansas General Corporation Code is patterned after Delaware's general corporation law, and the Kansas Supreme Court has found Delaware cases instructive.  *See Burcham v. Unison Bancorp, Inc.*, 77 P.3d 130, 144 (Kan. 2003); *Arnaud v. Stockgrowers State Bank of Ashland*, 992 P.2d 216, 218 (Kan. 1999) (stating that "Kansas courts have a long history . . . of looking to the decisions of the Delaware courts involving corporation law").

[10] *See Kennedy v. Dixon*, 439 S.W.2d 173 (Mo. 1969) (en banc).

[11] *See Thompson v. Crawford*, 833 S.W.2d 868, 871 (Mo.1992) (en banc).

[12] *Building Erection Services, Inc. v. JLG, Inc.*, 376 F.3d 800, 804 (8th Cir. 2004) (interpreting *Rajala v. Donnelly Meiners Jordan Kline, P.C.*, 193 F.3d 925 (8th Cir. 1999)).

[13] The Defendants have not argued that the corporate waste claims in Counts IV and V are barred by the statute of limitations.

[14] *See Community Title Co. v. U.S. Title Guar. Co., Inc.*, 965 S.W.2d 24, 25 (Mo. Ct. App. 1998).

4

barred by the statute of limitations since Farmland filed for bankruptcy less than five years before the Complaint was filed.[15]

## II. BACKGROUND

The relevant background for the Court's ruling on the Defendants' motion to dismiss is limited to the facts alleged in the Plaintiff's complaint and to Farmland's Articles of Incorporation.[16] Generally, Plaintiff alleges that the Defendants caused Farmland to enter into a series of ill-conceived transactions that individually and collectively constituted an abdication of their fiduciary obligations. Plaintiff argues that the Defendants' actions caused Farmland to lose hundreds of millions of dollars and ultimately fail, resulting in the largest bankruptcy in Kansas City history. The following specific facts, assumed to be true for purposes of this motion only, are culled from the Plaintiff's Complaint:

*Count I - The Coffeyville Fertilizer Complex*

In the 1990s, Farmland relied heavily on its fertilizer business. The nitrogen-based fertilizer used by Farmland contained anhydrous ammonia, which is made from natural gas. In 1996 or 1997, the Farmland board of directors was emphatic that if Farmland was going to stay in the fertilizer business, it could not always rely on natural gas. The Directors believed that the price of natural gas, which is a highly volatile commodity, would steadily rise in the future. Around that time, Coleman Ferguson ("Ferguson"), the retired manager of Farmland's refinery in Coffeyville, Kansas, recommended to Robert Honse, who was the executive vice president of Farmland's agricultural input business, that Farmland should consider building a fertilizer complex in Coffeyville which

---

[15] The Plaintiff also argues that its claims are timely under the adverse domination doctrine which, in the jurisdictions where it has been recognized, tolls the statute of limitations for corporate fiduciary duty claims during the time the corporation is controlled by the alleged malfeasors. *See, e.g., FDIC v. Hudson, 673 F.Supp.* 1039, 1042 (D. Kan. 1987); *Resolution Trust Corp. v. Fiala*, 870 F.Supp. 962, 972 (E.D. Mo. 1994) (holding that the adverse domination doctrine applies in Missouri, but acknowledging that Missouri courts have yet to rule on the issue). Under the doctrine, the Plaintiff maintains that its claims were tolled until Farmland filed bankruptcy. However, because the Court assumes here that Farmland's bankruptcy filing was the last item of damage for the fiduciary duty claims, it is not necessary for the Court to determine whether the adverse domination tolling doctrine applies here. Moreover, the application of the adverse domination doctrine requires a fact intensive inquiry which is not proper on a motion to dismiss.

[16] The relevant portions of the Articles are discussed in the Discussion section.

would produce ammonia for use in fertilizer's production using petroleum coke, a by-product of the existing refinery.  Such "gasification" technology and equipment was available from Texaco, Ferguson's previous employer.

The Texaco plant that Ferguson recommended was an experimental-prototype plant that had been shuttered and put in storage.  Honse spoke with Texaco representatives who advised him both on the technological feasibility of the gasifier as well as the economics of its use.  Farmland did not hire an outside consultant to advise Farmland regarding the accuracy of Texaco's representations as to the plant's feasibility or the economics of the proposed project.   However, before the Farmland Board approved the fertilizer complex project, Honse went to Japan with Ferguson and certain Texaco representatives to view a Texaco gasifier plant and to meet with Japanese representatives associated with the plant.  Honse learned that the Japanese company had experienced start-up problems with the gasifier.  Although there were other domestic and international producers of gasification technology, Defendants never spoke with these producers or reviewed their data.

On or about April 22, 1997, the Coffeyville Complex project was presented to the finance committee for consideration.  Monte Romohr, the Chair of the Finance Committee, did not believe it was the Finance Committee's role to oversee Farmland's officers nor did the members of the Finance Committee have much financial expertise.  On April 23, 1997, the Board followed a formal written agenda and considered the Complex proposal.   At the Board meeting, Honse and others advised the Board that the Complex would have an initial cost of approximately $252 million.  That estimate did not include at least $55 million in other anticipated costs, but the Board understood that it was evaluating a project requiring an investment of more than $300 million.

The Defendants believed the Complex would save Farmland $28 million per year and that its initial investment could be recouped in approximately nine years.  At the time, Farmland had approximately $1 billion in debt and it was understood that the Complex project would increase Farmland's debt load.  No Board member voted against the project or even suggested any modification to it.  Ultimately, the Board authorized spending $275 million on initial costs.

*Count II – The Acquisition of SF Services*

On or about April 23, 1998, the Board approved the acquisition of SF Services ("SF"), a company headquartered in North Little Rock, Arkansas.  SF distributed farm input products such

as animal feed, petroleum, propane, agricultural chemicals, and fertilizer in Arkansas, Louisiana, and Mississippi. SF was also involved in catfish[17] and convenience stores. Despite its diversified operations, SF had performed poorly, operating at a loss for a long period of time. SF had incurred more than $100 million in liabilities prior to the acquisition and had significant problems with its pension plan which was the subject of a dispute with the IRS. Representatives of CoBank, which was a lender to both SF and Farmland, recommended to someone at Farmland that Farmland should acquire SF.

Before authorizing the SF acquisition, Defendants were aware of SF's financial situation and its problems with the IRS and that SF's retail outlets had not performed well. After the acquisition, the SF businesses generated no income for Farmland.

*Count III – "Catastrophic Debt" and Mismanagement*

From 1992 to 2000, Cleberg, in his capacity as CEO, embarked on a strategy to diversify Farmland's operations and to increase sales, even at the expense of profitability. As a result, from 1996 to 2000, Farmland took on approximately $400 million in additional debt so that by 2000, its debt was at least $1.3 billion. Such a debt level was significantly higher than other cooperatives and Farmland's competitors. Although Farmland's gross revenue increased significantly until 2002, its actual profitability was steadily declining.

Farmland was significantly weakened financially under its debt load. As a result, Farmland was unable to successfully complete a merger with Cenex Harvest States ("CHS") and was forced to enter into imprudent joint ventures in an effort to lower debt and reduce costs. Declining financial performance caused lender and creditor confidence to decline and led to debt rating downgrades. Farmland's debt rating was eventually reduced to "junk" status. Consequently, it had to pay higher interest rates on new debt as well as its existing debt. Ultimately, Farmland had to file for bankruptcy as a result of its financial problems.

*Counts IV and V – Cleberg's "Sweetheart" Bonus and Corporate Waste*

One of the principal responsibilities entrusted to Cleberg as CEO of Farmland in 1999 was

---

[17] The Complaint does not indicate in what capacity SF was involved with catfish.

to consummate the merger with CHS. However, CHS's members did not approve the merger because of Farmland's high debt levels and because the proposed merger provided large cash payments to both companies' top executives, including Cleberg. Nevertheless, in or around February of 2000,[18] the Director Defendants unanimously approved and paid a special, one-time $700,000 bonus to Cleberg. The $700,000 bonus was more than Cleberg had earned in 1999 or was expected to earn in 2000 and was not money that Farmland owed Cleberg under any compensation agreement.

## IV. DISCUSSION

As a preliminary matter, the Court dispenses with the Defendants' argument that the Complaint should be dismissed because it only alleges claims for breaches of the fiduciary duty of care, and without more, those claims are precluded by the Exculpation Provision and the business judgment rule. To be sure, the Complaint does not allege, let alone mention, that the Defendants breached any other fiduciary duties, *i.e.* the duty of loyalty or the duty of good faith, or that they acted in bad faith. Nevertheless, in light of the fact that the Plaintiff does allege that the Defendants committed breaches of fiduciary (*plural*) "duties,"[19] and, perhaps more importantly, in consideration of the generous interpretation afforded a plaintiff's complaint on a motion to dismiss and the liberality with which leave is granted to amend such complaints, the Court will read the Complaint as if it had mentioned bad faith and breaches of the fiduciary duties of loyalty and good faith.

But, even reading those allegations into the Complaint, the Plaintiff fails to allege *facts* which would support such claims.[20]

---

[18] The Complaint does not give an exact date for the Directors' approval or Cleberg's receipt of the bonus.

[19] *See* Trustee's Response, p.25 listing reference in the Complaint where breaches of multiple fiduciary duties are supposedly alleged.

[20] *See Labram v. Havel*, 43 F.3d 918, 920 (4th Cir. 1995) ("Dismissal of a plaintiff's complaint is not warranted on the sole ground that the plaintiff mistakenly labeled its cause of action, provided it has pleaded facts supporting a claim against the defendant.").

The duty of loyalty requires an undivided and unselfish loyalty to the corporation and demands that there be no conflict between duty and self-interest.[21]  Scouring the Complaint fails to turn up any allegation that any of the Defendants acted out of self-interest.

The fiduciary duty of good faith (to the extent there is one)[22] requires an "honesty of purpose" and a genuine care for the fiduciary's constituents.[23]  In application, though, a lack of good faith is more easily detected in the converse, *i.e.*, by the presence of bad faith, and bad faith is defined as authorizing a transaction "for some purpose other than a genuine attempt to advance corporate welfare or [when the transaction] is known to constitute a violation of applicable positive law."[24]  In other words, an illegal action or one taken with the intent to harm the corporation constitutes an act of bad faith.[25]

Again, a thorough review of the Complaint fails to turn up a single allegation that states, suggests, or implies that any of the Defendants took any of the actions alleged in bad faith.  In fact, as discussed below, the Complaint pleads facts in Counts I-III that acknowledge that the Defendants' actions were taken with the intent to benefit the company, even though the consequences of those actions eventually were detrimental to Farmland.

---

[21] *MHC Inv. Co. v. Racom Corp.*, 254 F. Supp. 2d 1090, 1098 (8th Cir. 2002).  *See also*, *Waddell & Reed Financial, Inc. v. Torchmark Corp.* 337 F.Supp.2d 1243, 1251 (D. Kan. 2004) (citing *In re Reliance Securities Litigation*, 135 F.Supp.2d 480, 520 (D. Del.2001) (breach of duty of loyalty requires some form of self-dealing or misuse of corporate office for personal gain) and *Solash v. Telex Corp.*, 1988 WL 3587, at * 7 (Del. Ch. 1988) (absent any adverse financial or personal interest such as entrenchment motivation or effect, directors' approval of transaction unquestionably implicates only duty of care)).

[22] It is unclear whether there actually is a separate fiduciary duty of good faith.  *See In re Walt Disney Co. Derivative Litigation*, 2005 WL 2056651, *35 (Del. Ch. 2005) (discussing cases arguing for and against a separate fiduciary duty of good faith) (*Disney III*); *Unrau v. Kidron Bethel Retirement Services, Inc.*, 27 P.3d 1, 14 (Kan. 2001) ("Although the duty of good faith traditionally has been subsumed within the obligation of loyalty, the obligation of good faith cannot be treated as unique to or characteristic of fiduciaries because Kansas courts imply a duty of good faith and fair dealing in every contract.").  But the standard for good faith in the corporate context appears to be the same whether it is an implied or fiduciary duty.

[23] The court has not found any Kansas cases clearly defining good faith in the corporate fiduciary context, but generally, a director acts in good faith if he or she acts honestly, fairly, and lawfully and does not perpetuate fraud. *See Unrau v. Kidron Bethel Ret. Servs.*, 27 P.3d 1, 23 (Kan. 2001); *Sampson v. Hunt***,** 665 P.2d 743, 755 (Kan. 1983); *Newton v. Hornblower, Inc.*, 582 P.2d 1136, 1149 (Kan. 1978).  Other aspects of bad faith as defined by Kansas courts are discussed below with regard to overcoming the business judgment rule.

[24] *Disney III*, at 35 (citing *Gagliardi v. TriFoods Intern., Inc.*, 683 A.2d 1049, 1051 n.2 (Del. Ch. 1996)).

[25] *Id.*

In the absence of viable claims for breaches of the fiduciary duty of loyalty and good faith, the only issues remaining are whether the Complaint adequately states claims against the Officer Defendants and whether the Defendants are shielded from liability for their alleged breaches of the fiduciary duty of care by the Exculpation Provision or business judgment rule.

**A.     Dismissal of Officer Defendants – Counts I-III**

In Counts I-III, the Plaintiff alleges that the Officer Defendants breached their fiduciary duties to the Debtor by: recommending and embarking upon the Coffeyville Complex (Count I); evaluating and approving the merger with SF (Count II); and by "making numerous decisions" leading to the assumption of "catastrophic" levels of debt (Count III).[26]   The Defendants respond that the claims against Officer Defendants[27] should be dismissed for two reasons.  They contend that the Complaint fails to allege facts necessary to establish causes of action against them, and to the extent the Plaintiff may have adequately pled claims against the officers, the Defendants argue that those claims are barred by the business judgment rule.[28]

Both of the Defendants' arguments are correct, with some refinement.  The claims against Terry Campbell will be dismissed because the Complaint fails to sufficiently state any claims against him,[29] and all of the claims against Honse, as well the claims in Counts I-III against Cleberg for acts committed in his capacity as an officer of the Debtor, are barred by the business judgment rule.

---

[26] In addition to the reasons stated below, Count III may be dismissed against all Defendants because it is too vague to support a claim under any of the theories alleged, even under the generous federal notice pleading standards and the deference afforded a plaintiff's complaint in a motion to dismiss.  The Court will simply not allow the Plaintiff here to proceed on a claim that is devoid of any specific allegations against a specific Defendant.

[27] The discussion here only deals with the claims against Cleberg in his capacity as an officer of the Debtor.  Cleberg was also a director of the Debtor during the period covered by Counts I-III.  The claims against him in his capacity as director will also be dismissed for reasons stated below.

[28] The Defendants also contend that the Exculpation Provision shields the Officer Defendants from liability for breaches of the duty of care, but that contention is wholly without merit.  The right to exculpation arising from the Exculpation Provision is contractual.  On its face, the Exculpation Provision does not apply to officers, only directors.  Therefore, unless there is an ambiguity in the contract, *i.e.*, the Articles – which there is not – there is no legal basis to extend the protections of the Exculpation Provision to the Defendant Officers.

[29] Campbell is similarly protected by the business judgment rule, although that protection is largely unnecessary.

With regard to the claims against Campbell, the need for dismissal is obvious because the Plaintiff has not specifically pled *any* claims against him.  On a motion to dismiss, a plaintiff does not need to precisely state each element of its claims, but the plaintiff must plead minimal factual allegations on the material elements that must be proved.[30]  Furthermore, director and officer liability in breach of fiduciary duty actions is determined on an individual – rather than a collective – basis.[31]      The Plaintiff suggests in its response that there are "dozens" of specific allegations detailing the breaches of the officer defendants, but the Court counts only four references to Campbell: (1) in the caption; (2) in the introductory list of parties; (3) in the list of defendants at the beginning of Count I; and (4) in the list of defendants at the beginning of Count II.[32]  None of these references includes any specific allegation of wrongdoing by Campbell.  The Court acknowledges that all reasonable inferences from the Complaint must be drawn in favor of the Plaintiff, but the Court is not obliged to accept "every strained interpretation of the allegations proposed by the plaintiff."[33]  And the mere fact that Campbell  was an officer during the time the allegedly improper conduct took place is insufficient to establish a claim under any of the legal theories explicitly or implicitly advanced in the Complaint.[34]  Accordingly, Campbell will be dismissed from the lawsuit.

As to Honse and Cleberg, the Plaintiff alleges in Counts I-III that they breached their fiduciary duties of due care, loyalty, and good faith.  But, as noted above, the Plaintiff's Complaint is devoid of any factual allegations which would support a breach of loyalty claim.  Moreover, the Complaint fails to allege that Honse or Cleberg personally benefitted from any of the allegedly imprudent actions, or that they acted out of self-interest.  In the absence of such allegations, Honse and Cleberg are protected by the "business judgment rule," and are presumed to have acted in good

---

[30] *See Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991).

[31]  *In re Emerging Communications Inc. Shareholders Litigation.*, 2004 WL 1305745, at *38 (Del. Ch. 2004).

[32] The Plaintiff may have intended to implicate Campbell in Count III which is directed against "all Defendants," (Compl. ¶ 141) but, again, there are no specific factual allegations in Count III against Campbell.

[33] *Malpiede v. Townson*, 780 A.2d 1075, 1083 (Del. 2001).  *See also*, *Mattes v. ABC Plastics, Inc.*, 323 F.3d 695, 698 (8th Cir. 2003).

[34] *See, e.g., Continuing Creditors' Comm. of Star Telecomms. Inc. v. Edgecomb*, 2004 WL 29880736, *10 (D. Del. 2004).

faith and with due care.[35]

The business judgment rule is a judicial doctrine arising from courts' respect for corporate self-governance, as well as their dislike for second-guessing the business decisions of corporate directors and officers.[36]

> "The presumption [is] that in making business decisions not involving direct self-interest or self-dealing, corporate directors act on an informed basis, in good faith, and in the honest belief that their actions are in the corporation's best interest. The rule shields directors and officers from liability for unprofitable or harmful corporate transactions if the transactions were made in good faith, with due care, and within the directors' or officers' authority.' Black's Law Dictionary 192 (7th ed. 1999)."[37]

As stated by the Kansas Supreme Court, the rule appears to have a circularity – an officer's or director's good faith and informed action is presumed unless it is shown that the questioned transaction was not made in good faith or with due care, *i.e.*, in an informed manner.[38] That circularity is resolved, however, by case law which indicates that in order to survive a motion to dismiss based on an assertion of the business judgment rule, a plaintiff must allege fraud,[39] the lack of a good faith *motive* (versus general notions of good faith),[40] or that the business decision cannot

---

[35] "If a defendant does not breach his duty of loyalty to the company, he is permitted to rely on the business judgment rule or an exculpatory provision...to shield him from liability for a breach of the duty of care." *Id.* at *11 (quoting *Emerald Partners v. Berlin*, 787 A.2d 85, 90 (Del. 2001)).

[36] "It is not the function of the court to manage a corporation nor substitute its own judgment for that of the officers thereof.   It is only when the officers are guilty of willful abuse of their discretionary power or of bad faith, neglect of duty, perversion of the corporate purpose, or when fraud or breach of trust are involved, that the courts will interfere."  *Cron v. Tanner,* 64, 229 P.2d 1008, 1013-14 (1951).

[37] *Burcham v. Unison Bancorp, Inc.*, 77 P.3d 130, 147 (Kan. 2003) (quoting *Unrau v. Kidron Bethel Retirement Services, Inc.*, 27 P.3d 1, 14 (Kan. 2001)).

[38] The failure to act with due care is generally equated with the failure to act on an informed basis.  *See In re Nat'l Auto Credit, Inc. S'holders Litig.*, 2003 WL 139768, at *12 (Del. Ch. 2003) ("The duty of care requires that 'in making business decisions, directors must consider all material information reasonably available, and the directors' process is actionable only if grossly negligent.") (quoting *Brehm v. Eisner*, 746 A.2d 244, 259 (Del. 2000)).

[39] *In re Stoico Restaurant Group, Inc.*, 2000 WL 1146122, at *2 (D. Kan. 2000) ("Absent fraud, the business judgment rule precludes the courts from interfering with the discretion of corporate directors on 'questions of corporate management, policy, or business.'") (quoting *Samson v. Hunt*, 665 P.2d 743 (Kan. 1983)).

[40] *Id.*

be attributed to any rational business purpose.[41]

In this case, the Plaintiff has not alleged fraud or any facts which would indicate that the disputed transactions were motivated by anything other than a rational business purpose. In fact, the Complaint makes several allegations that are tantamount to admissions that Honse and Cleberg acted with legitimate business purposes. These include the allegations that the Coffeyville Complex was built to insulate the Debtor from climbing natural gas prices,[42] and that Farmland acquired SF and assumed debt to expand and diversify its operations.[43]

Some cases suggest that the business judgment rule can also be overcome by a showing that the officers or directors failed to act on an informed basis.[44] But it does not appear that the Kansas Supreme Court has embraced that position. Moreover, that position would appear to be at odds with the business judgment rule's presumption that officers and directors act on an informed basis.

For these reasons, Honse is dismissed from the lawsuit, and the claims in Counts I-III against Cleberg in his capacity as an officer (CEO) of the Debtor are also dismissed.

## B.    Dismissal of Director Defendants – Counts I-III

In Counts I-III, the Plaintiff alleges that the Director Defendants breached their fiduciary duties by approving or improperly delegating without sufficient oversight the decisions to build the Coffeyville Complex, merge with SF, and assume catastrophic debt (Counts I-III, respectively). The Defendants respond that those claims must be dismissed because: (1) the Exculpation Provision shields directors from personal liability for breach of duty of care claims, and those are the only claims alleged in Counts I-III of the Complaint; and (2) the claims are barred by the business judgment rule. The Plaintiff counters that neither the Exculpation Provision nor business judgment rule protects the Director Defendants because they are ineffective when a director has failed to act

---

[41] "A hallmark of the business judgment rule is that a court will not substitute its judgment for that of the board if the latter's decision can be 'attributed to any rational business purpose.'" *Unocal Corp. v. Mesa Petroleum Co.* *493 A.2d 946, 954* (Del. 1985) (quoting *Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 720 (Del. 1971)).

[42] Complaint, ¶ 49.

[43] Complaint, ¶ 94.

[44] *See, e.g., Smith V. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985); *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984).

in good faith, and, they contend, the Complaint contains allegations which, if accepted as true, would support a finding of bad faith.  Again, the Court agrees with the Defendants on both accounts.

Under the Exculpation Provision, the Director Defendants are shielded from personal liability to the extent "permitted or authorized by law" for acts or omissions taken in their corporate capacity.[45]  Section 17-6002(b)(8) referenced in the Exculpation Provision sets forth the contours of that protection:

> (8) a provision eliminating or limiting the personal liability of a director to the corporation or its stockholders, policyholders or members for monetary damages for breach of fiduciary duty as a director, provided that such provision shall not eliminate or limit the liability of a director (A) for any breach of the director's duty of loyalty to the corporation or its stockholders, policyholders or members, (B) *for acts or omissions not in good faith* or which involve intentional misconduct or a knowing violation of law, (C) under the provisions of K.S.A. 17-6424, and amendments thereto, or (D) for any transaction from which the director derived an improper personal benefit.[46]

Thus,  under § 17-6008(b)(8), the Director Defendants are entitled to dismissal of Counts I-III as a matter of law because they are individually protected from liability by the Exculpation Provision unless the Plaintiff has sufficiently pled facts that implicate the exceptions to exculpation set forth in subsections A, B, C, or D.

The Plaintiff maintains that subsection B applies because the Complaint alleges facts which would support a finding that the Defendants failed to act in good faith,[47] and, therefore, dismissal

---

[45] Art. VII, § 2 of the Articles provides: ". . . to the fullest extent permitted or authorized by the laws of the State of Kansas, including without limitation the provisions of subsection (b)(8) of Kan. Stat. Ann. § 17-6002 (1981) no person who is currently or shall hereinafter become a director of the Association shall have personal liability to the Association for monetary damages for breach of fiduciary duty as a director for any act or omission occurring subsequent to the date this provision becomes effective.  If the Kansas General Corporation Code is amended after approval of this provision by the shareholders of the Association, to authorize corporate action further limiting or eliminating the personal liability of directors, the liability of a director of the Association shall be limited or eliminated to the fullest extent permitted by the Kansas General Corporation Code, as so amended."

[46] K.S.A. §17-6002(b)(8).  Section 17-6002(b)(8) is patterned after Del. Code Ann. tit. 8, § 102(b)(7).  The purpose of the Delaware provision, as noted Delaware Supreme Court, is to provide shareholders with the option to "adopt a provision in the certificate of incorporation to free directors of personal liability in damages for due care violations, but not duty of loyalty violations, bad faith claims, and certain other conduct."  *Malpiede v. Townson*, 780 A.2d 1075, 1095 (Del. 2001).

[47] The Plaintiff has not suggested nor has the Court found any support for a finding that any of the other subsections apply, except to the extent that some courts have suggested that a violation of the duty of good faith is tantamount to a breach of the duty of loyalty.

14

of its claims is not warranted.    But there are two hurdles the Plaintiff fails to overcome in establishing (for purposes of the motion to dismiss) the Defendants' lack of good faith.

First, the Complaint fails to allege facts sufficient to overcome the business judgment rule's presumption that the directors acted in good faith.    As noted above, under the business judgment rule an officer's or director's good faith is presumed unless a plaintiff establishes, or – for purposes of a motion to dismiss – alleges  that the officer or director committed fraud, lacked a good faith *motive* (versus general notions of good faith), or that the business decision cannot be attributed to any rational business purpose.    The Plaintiff's Complaint does not allege any of those things.    Nothing in the Complaint even hints at fraud.    And the same allegations mentioned above which acknowledge that the officers acted with a proper motive and legitimate business purpose support a finding that the directors acted in good faith in overseeing and approving the construction of the Coffeyville Complex, approving the SF merger, and assuming the allegedly catastrophic debt.

The second hurdle the Plaintiff fails to clear is that even in the absence of the presumption of good faith, the Complaint fails to independently allege facts sufficient to support a finding of bad faith.    To wit, the Plaintiff relies on two Delaware cases[48] – *Disney II* and *Elkins* – which hold that a violation of the duty of care, *i.e.*, acting without consideration of all of the information reasonably available, can be so egregious that it constitutes a breach of the duty of good faith.    But the facts alleged in the Complaint do not rise to the level necessary to establish such a breach.

Because *Elkins* is an "unpublished" decision and basically applies the holding in *Disney II* without significant variation, the Court will focus its attention on *Disney II*.

The issue before the Court in *Disney II* is analogous to the one *sub judice* in that the Defendants in *Disney II* were also seeking the dismissal of a Complaint, which on its face only alleged a breach of the duty of care, on the basis of an exculpation provision similar to the one relied upon by the Director Defendants.    The *Disney II* complaint alleged that the CEO of Disney, Michael Eisner ("Eisner"), unilaterally decided to hire Michael Ovitz ("Ovitz"), his friend of twenty-five years, as the president of Disney.[49]    Eisner presented to Disney's board of directors his request to

---

[48] *In re The Walt Disney Co. Derivative Litig.*, 825 A.2d 275 (Del. Ch. 2003) (*Disney II*); *Official Committee of Unsecured Creditors of Integrated Health Services, Inc. v. Elkins*, 2004 WL 1949290 (Del. Ch. 2004) ("*Elkins*").

[49] *Disney II*, 825 A.2d at 279.

hire Ovitz while the employment agreement was still a "work in progress."[50]  No presentations were made to the board on the terms of the draft agreement.[51]  No board member considered the amount Ovitz could receive under the contract in the event of a non-fault termination.  The board left Eisner to complete the negotiations with Ovitz.[52]  And the final contract – which differed significantly from the draft previously presented to the board – was signed "without any board input."[53]

Based on these facts, the Court denied the Defendants' motion to dismiss  finding that the duty of care violations were so egregious that they cast doubt on whether the board's actions were taken in good faith, and therefore beyond the scope of the exculpatory provision.  The *Disney II* court stated:

> These facts, if true, do more than portray directors who, in a negligent or grossly negligent manner, merely failed to inform themselves or to deliberate adequately about an issue of material importance to their corporation. Instead, the facts alleged in the new complaint suggest that the defendant directors consciously and intentionally disregarded their responsibilities, adopting a "we don't care about the risks" attitude concerning a material corporate decision. Knowing or deliberate indifference by a director to his or her duty to act faithfully and with appropriate care is conduct, in my opinion, that may not have been taken honestly and in good faith to advance the best interests of the company. Put differently, all of the alleged facts, if true, imply that the defendant directors knew that they were making material decisions without adequate information and without adequate deliberation, and that they simply did not care if the decisions caused the corporation and its stockholders to suffer injury or loss. Viewed in this light, plaintiffs' new complaint sufficiently alleges a breach of the directors' obligation to act honestly and in good faith in the corporation's best interests for a Court to conclude, if the facts are true, that the defendant directors' conduct fell outside the protection of the business judgment rule.[54]

Despite the Plaintiff's protestations, the Court does not believe that the conduct alleged in Counts I-III rises to the level of deliberate indifference described in *Disney II.*  The *Disney II* "test"

---

[50] *Disney II*, 825 A.2d at 287.

[51] *Id.*

[52] *Id.* at 281.

[53] *Id.* at 288.

[54] *Id.* at 289.

for bad faith does not require that directors be without fault in their efforts to apprise themselves of all of the information reasonably necessary to make a decision. Rather, the *Disney II* court only found bad faith where the conduct at issue went beyond gross negligence and demonstrated an "intentional disregard" of their responsibilities and a "we don't care about the risks" attitude. Because the Complaint here specifically acknowledges that the board approved the decision to build the Coffeyville Complex after *some* consideration was given to alternatives to, and risks/costs associated with, the project, it precludes a finding of bad faith under the *Disney II* standard.

The allegations in the Complaint are also insufficient to establish that the decision to approve the SF merger was not made in good faith. According to the Complaint, the Director Defendants considered the potential downsides to the merger, but approved it for the purposes of diversifying the Debtor's business – a rational business purpose. Again, for purposes of a *Disney II* analysis, it is not important that the Director Defendants may have been negligent, even grossly negligent, in underestimating the risks; the fact that they made an effort to apprise themselves of the risks precludes a finding of bad faith on that point.

With regard to Count III, the allegations are so vague that it is difficult to apply the *Disney II* test, but it is enough to note that the Complaint precludes a finding of bad faith because it alleges that the decision(s) to assume debt was made for a rational business purpose – the expansion and diversification of the Debtor.

Finally, the Court notes another difference between this case and *Disney II,* one that is sufficient by itself to render the *Disney II* analysis inapplicable to this case. Namely, in *Disney II* the court noted that the fact that Eisner and Ovitz had been close friends for over twenty-five years "casts doubt on the good faith and judgment behind the Old and New Board's decision to allow two close personal friends to control the payment of shareholders' money to Ovitz."[55] The Complaint here, however, does not contain any similar allegation which would cast such a negative pall on the Director Defendants' decisions criticized in Counts I-III.

For these reasons, the Court finds that the Plaintiff's Complaint fails to support a finding that the Director Defendants acted in bad faith when they engaged in the conduct described in Counts I-III; therefore, the Exculpation Provision in the Debtor's Articles of Incorporation shields them

---

[55] *Disney II*, 825 A.2d at 286 n.30.

from personal liability for that conduct, and the Court will dismiss Counts I-III against the Director Defendants.

### C.      Count IV - Retention of Waste Claim Against Officer Defendant Cleberg

In Count IV of the Complaint, the Plaintiff claims that the Director Defendants violated their fiduciary duty of care by awarding Cleberg a $700,000 bonus in 2000 for his work as Farmland's CEO in 1999, and that Cleberg violated his fiduciary duty of care by accepting the bonus. Cleberg and the Director Defendants argue that they are shielded from liability by the Exculpation Provision, or, alternatively, that they are presumed to have acted in accord with their fiduciary duty of care pursuant to the business judgment rule.

The Director Defendants are entitled to the dismissal of Count IV against them for the same reasons Counts I-III are being dismissed – the Complaint fails to allege facts sufficient to overcome the Exculpation Provision or the business judgment rule.

However, neither shield can be used by Cleberg in this instance.

First, as discussed above, the Exculpation Provision does not apply to the Officer Defendants, and Cleberg was an officer (as well as a director).

Second, the business judgment rule does not protect Cleberg's acceptance of the bonus because the business judgment rule only protects corporate decisions made by officers or directors who do not benefit from, or have a personal interest in, the outcome.[56] Accepting a financial bonus is by its very nature a self-interested benefit; therefore, the business rule presumption cannot be applied to Cleberg's acceptance of the $700,000 bonus. Accordingly, the motion to dismiss is denied on Count IV as to Cleberg.

### D.      Count V – Retention of Corporate Waste Claim against Director Defendants

Count V of the Plaintiff's Complaint alleges that the Director Defendants committed corporate waste when they unanimously approved the $700,000 bonus to Cleberg in 2000 despite Cleberg's failure to consummate a merger with CHS, which was one of his key goals for 1999. The $700,000 bonus was more than Cleberg earned in 1999 or was expected to earn in 2000 and was not

---

[56] *See Unified Sch. Dist. No. 233 Johnson County v. Kan. Ass'n of Am. Ed.*, 64 P.3d 372, 379 (Kan. 2003).

18

money that Farmland owed Cleberg under any compensation agreement.[57]   Therefore, the Plaintiff concludes, the Debtor received no consideration for the bonus.[58]

In response, the Defendants again argue that Count V should be dismissed because the Complaint fails to allege facts sufficient to overcome the business judgment rule or render the Exculpatory Provision ineffective.  Alternatively, the Defendants contend that a plaintiff asserting a corporate waste claim must plead facts which establish "a complete *failure* of consideration,"[59] and the allegations in the Complaint suggest that he accomplished *some* of his goals.  Therefore, they argue, the corporate waste claim must fail because Cleberg provided some consideration (a peppercorn, if you will).

Although, the corporate waste standard is "very rarely" satisfied,[60] the Court finds that the Complaint alleges facts which, when given every reasonable inference, could support a claim that the Debtor did not receive sufficient consideration for the bonus.  Furthermore, if there was, in fact, a *complete* absence of consideration for the bonus, it would suggest (although not definitively) that the Director Defendants did not act in good faith, inasmuch as the bonus would serve no rational business purpose[61] and might constitute a "conscious disregard" for the consequences of their decision, similar to that in *Disney II.*

Therefore, the motion to dismiss will be denied as to all Defendants on Count V.

## V.   CONCLUSION

For the reasons stated above, the Court will dismiss all of Plaintiff's claims, except Count IV against Defendant Cleberg and Count V against all of the Directors.  Defendants have requested that the Court deny the Plaintiff leave to amend the Complaint.  While the Court shares the Defendants' concern that it is unlikely that the Plaintiff can assemble additional facts at this juncture

---

[57] Compl. ¶ 160.

[58] Compl. ¶ 161.

[59] Motion to Dismiss, 23 (quoting *In re 3Com Corp.*, No. 16721, 1999 WL 1009210, at *4 (Del. Ch. 1999) (emphasis in original)).

[60] *Criden v. Steinberg*, 2000 Del. Ch. Lexis 50, *9 (Del. Ch. 2000).

[61] Compl. ¶¶ 161-63.

that would rectify the deficiencies in the Complaint, the policy of liberally granting leave to amend and the Court's inclination to adjudicate matters on their merits favor granting the Plaintiff a limited time within which it may amend its Complaint.  Therefore, the Court will grant the Plaintiff 30 days to amend its Complaint.

A separate order consistent with this Memorandum Opinion will be entered pursuant to Fed. R. Bankr. P. 9021.

**ENTERED** this 16th day of November 2005.

    /s/    Jerry W. Venters
United States Bankruptcy Judge

Copy of the foregoing mailed electronically or
conventionally to:
Terrence J. Campbell
Matthew T. Geiger
Robert A. Hammeke
Calvin J. Karlin
Benjamin F. Mann
Todd W. Ruskamp
Mark Moedritzer
Michael J Small
David B. Goroff
Michael J. Thompson